IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
NO. 2:09-CV-37-BO

| | |
|---|---|
| SUSAN C. TURNER, *individually and as Administratrix of the Estate of Roger W. Turner, Jr.*, Plaintiff, | )<br>)<br>)<br>)<br>) |
| v. | )     O R D E R |
| UNITED STATES OF AMERICA and UNITED STATES COAST GUARD, Defendants. | )<br>)<br>)<br>)<br>) |

This matter is before the Court on the United States' Motion for Summary Judgment [DE 133]. Plaintiff responded on May 1, 2012 [DE 137] and again on May 4, 2012 [DE 147]. The United States replied on May 18, 2012 [DE 151] and the motion is now ripe for adjudication. Because there is no genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law, the Motion for Summary Judgment is GRANTED.

## BACKGROUND

This case arises from a tragic set of facts. Plaintiff Susan C. Turner brought this personal injury action brought under the Suits in Admiralty Act, 46 U.S.C. § 30901-30918 ("SIAA"), for injuries she sustained after she fell from her boat into the Albemarle Sound. Ms. Turner and her husband, Roger W. Turner, Jr., were returning from a Fourth of July party in their boat when Ms. Turner fell overboard, at around 9:00 p.m. on July 4, 2007. Soon thereafter, Ms. Turner lost sight of her husband in their boat. She eventually came ashore twelve hours later, around 9:20 a.m. on July 5, 2007. Mr. Turner, already deceased, was discovered on the morning of July 7, 2007.

Ms. Turner alleges that the United States Coast Guard was negligent in its handling of the

search for the Turners, resulting in physical and psychological injuries to Ms. Turner. The facts relevant to this motion, as established in affidavits provided by the parties, are as follows:

On July 4, 2007, Mr. and Ms. Turner boarded their private twenty-foot long Maycraft boat from their home on the Little River, which was next door to Mr. Turner's father's home. Mr. Roger Turner, Sr., in discussing his son's holiday plans, had learned that the Turners would either be going to the Pasquotank River, the Perquimans River, or Mann's Harbor. In fact, they traveled to a party at the home of Mr. and Ms. Lonnie Bunch on the Perquimans River that night. Mr. Roger Turner, Sr. became concerned when his son and daughter-in-law did not return by 9:30 p.m. and attempted calling their cell phones, beginning at around 10:45 p.m. They did not answer. He continued calling, without success, until around 12:45 a.m. on July 5. At that time, he called 911 and spoke with a representative of the Pasquotank County Sheriff's Office. That office relayed the information given by Mr. Turner, Sr. to the Coast Guard's District 5 command center which, in turn, relayed the information to the command center at Coast Guard Sector North Carolina, at about 1:00 a.m. on July 5.

The Coast Guard called Mr. Turner, Sr. to obtain additional information. During that call, Mr. Turner, Sr. informed the Command Duty Officer, Chief Petty Officer Sudsberry, that his son had indicated that the Turners might be going to the Perquimans River, the Pasquotank River, or to Mann's Harbor. He also mentioned the possibility that the Turners had gone to a friend's cabin at another location. Later that morning, Chief Sudsberry called Mr. Turner, Sr. to inform him that the lack of specific information about the Turners' whereabouts and the current lack of available search assets resulted in a decision that the Coast Guard should not, at that time, initiate an active search for the Turners' overdue boat.

At around 1:00 a.m., a helicopter that was engaged in a search for an overdue jet ski was

headed up the Pasquotank River to Elizabeth City to refuel. The Sector Command Duty Officer directed the helicopter crew to look for the Turners' boat as it flew over the Pasquotank River. The helicopter crew did not see any evidence of the Turners or their boat on the Pasquotank River.

At around 8:30 a.m. on July 5, Mr. Lonnie Bunch, the host of the Fourth of July party attended by the Turners before the accident, received a call from a friend indicating that the Coast Guard was making calls to try to locate the Turners' boat. Mr. Bunch took his own boat up the Perquimans River to look for the Turners. At approximately 9:00 a.m., he discovered the Turners' boat on Reed Point. The boat was empty and the lights, GPS, depth finder, and radio on. The engine was off, the throttle was in neutral, and two cell phones, a wallet, and Ms. Turner's purse were in the console. Mr. Bunch called a friend to notify the Coast Guard that the Turners' boat had been found without anyone on board. Upon learning this information, the Coast Guard Sector North Carolina Command Duty Officer reclassified the incident from a "possible overdue" to an "overdue distress" case and launched air and sea assets to search for the Turners. Ms. Turner came ashore shortly thereafter, at around 9:20 a.m. on July 5, 2007 in Hertford, North Carolina. By her account, she had remained afloat in the Perquimans River and Albemarle Sound by swimming, treading water, and holding on to crab pot buoys. Mr. Turner was found, deceased, at the water's edge in Hertford on the morning of July 7, 2007.

## DISCUSSION

### Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247-48 (1986). The Court must view the facts and draw reasonable inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears the initial burden to show the court that there is no genuine issue concerning any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-moving party must then show that there is "evidence from which a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 257.[1]

In order to establish a prima facie case for maritime negligence, a plaintiff must establish that (1) the government owed her a duty of care, (2) the government breached that duty, and (3) the government's breach of duty was a proximate cause of the plaintiff's injuries. *McMellon v. United States*, 338 F.3d 287, 293 (4th Cir. 2003) (*McMellon I*), *vacated en banc on other grounds*, 387 F.3d 329 (4th Cir. 2004) (*McMellon II*). In its motion for summary judgment, the United States argues that Ms. Turner is unable to establish a prima facie negligence case because (1) the United States owed no duty to search for Ms. Turner; and (2) when the Coast Guard did initiate a search for Ms. Turner (July 5 at 10:00 a.m., when the Turners' boat was discovered without anyone on board), she was already safely ashore. Even if the Coast Guard initiated a search before 10:00 a.m. on July 5, the United States argues that there is no evidence that it acted recklessly or wantonly, or that its actions worsened Ms. Turner's condition. It also argues that the United States would not be liable for its discretionary decisions as to when to initiate a

---

[1] Although Defendants' motion for summary judgment was filed 12 months after the close of the time set aside in the pretrial order for filing dispositive motions, the filing of a motion for summary judgment was discussed at a hearing before the undersigned on March 30, 2012. Ms. Turner's counsel was present at that hearing and had sufficient notice that a motion may be filed. *See Allstate Ins. Co. v. Fritz*, 452 F.3d 316, 323 (4th Cir. 2006). Even when a motion for summary judgment is filed out of time, a district court may exercise its discretion to entertain the motion. *Gomez v. Tr. of Harvard Univ.*, 676 F. Supp. 13, 15 (D.D.C. 1987); *Lopez v. NTI, LLC*, 748 F. Supp. 2d 471, 475-76 (D. Md. 2010). Plaintiff's arguments on estoppel and laches are inapposite and unavailing.

search, how many search assets and personnel to commit, or the methods and procedures used in search and rescue.

## I. The Coast Guard Does Not Have A Duty To Undertake A Rescue.

The United States is immune from suit, except insofar as it has consented to be sued through waiver of its sovereign immunity. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). The Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 30901-30918, is the exclusive waiver of sovereign immunity for maritime torts that do not involve public vessels. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). In order for a suit to fall within this waiver of sovereign immunity, a plaintiff must show that the United States would be liable under maritime tort law for the same conduct. *Sagan*, 342 F.3d at 497-98. Further, the United States cannot be held to a different standard than a private person. *McMellon II*, 387 F.3d at 340. In other words, contrary to Ms. Turner's assertions, federal agency guidance and internal government manuals cannot create duties of care to the public. *See, e.g., Thompson v. United States*, 592 F.2d 1104, 1110 (9th Cir. 1979).

The Suits in Admiralty Act incorporates a discretionary function exception that mirrors the scope of the discretionary function exception set forth in the Federal Tort Claims Act, 28 U.S.C. § 1346(b), §§ 2671-2680. *McMellon II*, 387 F.3d at 349. The Federal Tort Claims Act's discretionary function exception provides that its waiver of sovereign immunity does not apply to:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency, or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The discretionary function applies if the challenged conduct (1) involved

"an element of judgment or choice" and (2) was "grounded in social, economic, or political policy." *United States v. S.A. Empresa de Viacao Rio Grandense*, 467 U.S. 797, 813-14 (1984). When an agent's challenged decision falls within the discretionary function exception, a court must dismiss the claims for lack of subject matter jurisdiction. *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009). In such a case, subject matter jurisdiction is lacking "whether or not the discretion involved [was] abused." 28 U.S.C. § 2680(a).

Although the Coast Guard provides rescue services to mariners in distress, the decision to render any assistance is discretionary. *Hurd v. United States*, 134 F. Supp.2d 745, 771-72 (D.S.C. 2001), *aff'd* No. 01-1680, 2002 WL 730284 (4th Cir. Apr. 25, 2002) (unpublished). The Coast Guard cannot be held liable for failing to begin an active search earlier than it did, even if a court would have considered its delay unreasonable. *Daley v. United States*, 499 F. Supp. 1005, 1009 (D. Mass. 1980). Further, the plaintiff bears the burden to prove that the discretionary function exception does not apply. *Indem. Ins. Co. of N. Am. v. United States*, 2008 WL 4935936, *aff'd* 569 F.3d 175 (4th Cir. 2009). Therefore, this court lacks subject matter jurisdiction to evaluate the reasonableness of the Coast Guard's exercise of its discretion prior to undertaking a rescue. Until the Coast Guard undertook a rescue for Ms. Turner, it owed her no duty of care and cannot be held liable for injuries sustained prior to its undertaking the rescue effort.

### II. In This Case, The Coast Guard Did Not Undertake A Rescue Until Approximately 9:00 a.m. On July 5, 2007, At The Earliest.

Although the Coast Guard is not under a duty to undertake a rescue, it must act with reasonable diligence once a rescue is undertaken. *Sagan*, 342 F. 3d at 498 (citing *Patentas v. United States*, 687 F.2d 707 (3d Cir. 1982)). Whether or not there has been an attempt to rescue or render aid is a question of fact. *See Furka v. Great Lakes Dredge & Dock Co.*, 755 F.2d 1085,

1088 (4th Cir. 1985), *cert. denied*, 474 U.S. 846.

In this case, the evidence demonstrates that the Coast Guard first learned of the Turners' overdue boat at approximately 1:00 a.m. on July 5, when Mr. Turner, Sr. called 911 to express his concern that his son and daughter-in-law had not yet returned when expected. Sudsberry Depo., ¶¶ 78:18-79:22, 129:12-20. Ms. Turner asserts that the Coast Guard was contacted by Roger Turner, Jr. before 10:00 p.m. on July 4, resulting in an entry in the Coast Guard MISLE incident report reading "response resource requested." at 9:58 p.m. However, no evidence indicates that the call was made by Mr. Turner, Jr. or that the incident report entry reflects any search assets that were dispatched or any search that was undertaken at that time. Dender Depo. ¶ 93:16-100:21; Sudsberry Depo. ¶ 201:22-203:10. Ms. Turner did not present any evidence to contradict the affidavits from Coast Guard personnel.

Nor did the helicopter overflight of the Pasquotank River at around 1:35 a.m. constitute a rescue triggering a duty of care. Officer Sudsberry testified in his deposition that, as command duty officer at Sector North Carolina, he considered the overflight to be an opportunity to gather additional information, not an undertaking of a rescue. Sudsberry Depo. ¶ 149:18-150:1. Information-gathering activities conducted by the Coast Guard do not constitute an active search and they cannot provide a basis for imposing liability for a maritime negligence action. *Daley v. United States*, 499 F. Supp. 1005, 1009 (D. Mass. 1980) ("instituting a PRECOM commits the Coast Guard to nothing [and] [f]ailure to follow it up is not comparable to abandoning a search that is already underway."); *In re Compl. of United States (USCGC Point Judith)*, No. CV 86-4186, 1987 WL 90270 at *3 (C.D. Cal. Jun. 5, 1987) (unpublished); *Valentine v. United States*, 630 F. Supp. 1126, 1131 (S.D. Fla. 1986). This initial information-gathering has been distinguished by the Fourth Circuit from cases in which the Coast Guard has gotten "past the

information gathering stage" because it "had specific reason to believe someone was in danger, and they knew precisely where that danger was located." *Hurd*, 2002 WL 730284 at *4.

In this case, until Mr. Bunch located the Turners' empty boat, the Coast Guard had no evidence that the Turners were in distress or even where they might be. Sudsberry Depo. ¶ 136:1-137: 5. Mr. Turner, Sr. had conveyed four potential locations where his son and daughter-in-law might have been located. Contrary to Ms. Turner's assertion, the overflight did not provide sufficient information to undertake a search at that time. As Officer Sudsberry noted, "it wasn't an active search and rescue case because we had very little information." Sudsberry Depo. ¶ 148:12-18. Because the overflight did not result in any additional evidence about the whereabouts of the Turners, the Coast Guard continued to lack information as to "where [the] danger was located."

After Mr. Bunch located the Turners' empty boat, the Coast Guard reclassified the incident from an "overdue case" to a "person-in-the water case" or a "distress case." Sawyer Depo. ¶ 30: 10-23; 31: 4-15. Ms. Turner came ashore at approximately 9:20 a.m. on July 5, no more than twenty minutes after the Coast Guard learned of the empty boat's recovery. In order to survive the Coast Guard's motion for summary judgment, then, Ms. Turner would need to establish a genuine issue of material fact as to whether the Coast Guard breached its Good Samaritan duty of care to her within that short time frame.

### III. Once The Coast Guard Undertook Its Rescue For The Turners, Ms. Turner Has Not Established A Genuine Issue of Material Fact Regarding Any Breach of Its Duty of Care.

Once the Coast Guard undertook to rescue the Turners, it became subject to the Good Samaritan duty of care. *Sagan*, 342 F.3d at 498. This duty of care provides that a rescuer, such as the Coast Guard, is liable for breach of a duty "voluntarily assumed by affirmative conduct, even

when that assumption of duty was gratuitous." *See Indian Towing Co. v. United States*, 350 U.S. 61 (1955). In order to survive summary judgment in such a case, the plaintiff must produce evidence sufficient to create a genuine issue of material fact as to whether the Coast Guard engaged in reckless and wanton conduct or whether it failed to exercise reasonable care in a way that worsened the position of the victim. *Hurd*, 134 F. Supp. 2d at 773; *Sagan*, 342 F.3d at 498. Reckless and wanton conduct can occur in two ways: either by increasing the risk of harm to the person in distress or by inducing reliance on the rescue by the rescuer or by other potential rescuers. *Hurd*, 134 F. Supp. 2d at 772. Ms. Turner has failed to establish a genuine issue of material fact under either theory of breach of the Coast Guard's duty of care.

First, there is no evidence that the manner in which the Coast Guard searched for the Turners increased the risk of harm to Ms. Turner. The Coast Guard undertook to search for the Turners shortly after 9:00 a.m. and Ms. Turner came ashore in Hertford at approximately 9:20 a.m. Ms. Turner does not allege that any reckless conduct occurred during the course of the rescue and within that time frame. *See Furka*, 824 F.2d at 332.

Second, there is no evidence that Ms. Turner relied on the Coast Guard's rescue to her detriment or that other potential rescuers relied on the Coast Guard's search and rescue efforts. Ms. Turner alleged that the North Carolina Wildlife Resources Commission ("Wildlife") relied on Petty Officer Bouknight's representations about a Coast Guard rescue effort and that, as a result of that reliance, "did not send personnel or resources...to initiate, participate or assist in search and rescue efforts for [the Turners]" [DE 20 at 6]. However, the Coast Guard never represented to Wildlife that it was undertaking a search or rescue. Rather, Petty Officer Bouknight told Mr. Williams at Wildlife that the area described by Mr. Turner, Sr. was "just a huge area, so we really have nowhere to search, so at this point in time we are sitting tight and conducting call outs...[and]

PRECOMS..." [DE 147-3 at 11]. Wildlife Officer Mark Rich also testified that Wildlife would not have searched for the Turners that night under the described conditions and with the limited amount of information available to it at that time [DE 132-1 at 23-24]. Further, Ms. Turner has provided no evidence that she relied to her detriment on the Coast Guard's rescue efforts.

The Court recognizes the great trauma and loss that Ms. Turner suffered as a result of her boating accident. However, absent evidence of reckless and wanton conduct by the Coast Guard, it simply cannot be held liable for Ms. Turner's injuries resulting from the tragic events of July 4-5, 2007.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [DE 133] is GRANTED.

SO ORDERED, this the _9_ day of June, 2012.

TERRENCE W. BOYLE
UNITED STATES DISTRICT JUDGE